| | |
|---|---|
| **WILBERT, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| **CRAIG HOMAN,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## I.  BACKGROUND

This action was originally filed in Superior Court in Gaston County, North Carolina and was removed to this Court on January 17, 2013.  (Doc. No. 1).  The parties dispute the legal effect of a decision by a third party to whom the parties agreed to submit disputes related to the post-closing valuation of a company following its purchase by Plaintiff from Defendant. Plaintiff petitions this Court to regard the decision as an arbitration award and enter judgment against Defendant for the claim.  (Doc. Nos. 13,14,18).  Defendant contends that the decision should be construed as an appraisal and that the Court should deny Plaintiff's motion. (Doc. No. 17).

A.  Factual Background

On June 24, 2011, the parties entered into a Stock Purchase Agreement (Agreement/SPA) for the sale of Defendants' shares of CH Industries, a plastic molding business, to Plaintiff.  The parties identified South Carolina law as governing the Agreement.  (Doc. No. 1-1: SPA § 7.8). Under the Agreement, Plaintiff purchased all of the stock of CH Industries from Defendant for $19,000,000, subject to certain post-closing adjustments to determine more accurately the Net

Working Capital and income tax at the time of the closing. (Id. § 2.2). The Agreement established a baseline Net Working Capital of $2,933,000 and determined that the purchase price at closing would be adjusted to the extent that an estimate of Net Working Capital proffered by Defendant differed from the baseline amount. (Id.: Complaint: ¶¶ 13-15). At closing, the Net Working Capital was estimated at $3,689,282.06, reflecting a difference of $756,282.06 from the baseline amount. (Id.). The parties also agreed to conduct a post-closing reconciliation of Net Working Capital wherein the parties would attempt to ascertain and resolve the actual cash balance, Net Working Capital and income tax (tax liability and taxes receivable) on the date of closing. (SPA: §§ 2.2.3 – 2.2.5). The Agreement provided that, in the event that the parties could not agree on figures for these amounts, they would employ an independent accountant, Dixon Hughes Goodman LLP (Dixon Hughes), to resolve the matter. (Id. § 2.2.5). The Agreement held that Dixon Hughes' determination was "binding upon the parties." (Id.).

Unable to agree on an amount for the final Net Working Capital and income taxes, the parties submitted the dispute to Dixon Hughes. On December 12, 2012, an agent from Dixon Hughes rendered his decision that the final Net Working Capital was $2,929,555, which resulted in a downward adjustment of the purchase price by $759,727.06. (Doc. Nos. 1-1: Complaint ¶¶ 21-23; 13-1 at 2). On September 13, 2013, the agent determined that the amount of Income Tax Receivable was $181,004, which resulted in an upward adjustment of the purchase price. (Doc. No. 13-2 at 2). Offsetting these amounts, the post-closing assessments reduced the purchase price in Plaintiff's favor by $578,723.06, which Plaintiff now requests this Court to enforce against Defendant. (Doc. No. 13 ¶ 17).

**II. ANALYSIS**

    A. <u>State or Federal Definition</u>

As the parties do not contest the calculations or determination made by Dixon Hughes, the sole dispute at issue is whether the ruling constitutes arbitration and can be enforced by this Court. The Federal Arbitration Act (the Act/FAA), while governing arbitration agreements involving interstate commerce, does not provide a specific definition as to what constitutes arbitration. Into this void, several federal appellate courts, notably the Fifth and Ninth Circuits, have stepped applying the definition provided by the law of the state governing the contract. See, Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579 (9th Cir. 1987); Hartford Lloyd's Ins. Co. v. Teachworth, 898 F.2d 1058 (5th Cir. 1990). Other Circuit Courts, including the First, Second, and Tenth, have looked to federal common law to provide a uniform definition under the logic that whether an agreement amounts to "arbitration" under the Act depends on what Congress meant by the term under a federal statute. See, Fit. Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1, 6 (1st Cir. 2004); Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135, 707 F.3d 140 (2d Cir. 2013); Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc., 390 F.3d 684, 688-89 (10th Cir. 2004).

Although the Fourth Circuit has not addressed this issue, our sister court in Maryland recently did in Liberty Mutual Group, Inc. v. Wright, No. DKC 12-cv-282, 2012 WL 718857 (D. Md. Mar. 5, 2012). The issue in Liberty Mutual – whether a method of dispute resolution used by the parties was governed by the Act – turned on how the court defined arbitration. It also implicated the same threshold decision as here: whether to apply the definition provided by the state law governing the contract, or to look to federal common law. In that case, Judge Chasanow ruled that "[b]ecause 'Congress did not plainly intend arbitration to mean different things in different states' . . . , it is appropriate to apply federal law – rather than state law – when

3

evaluating whether the FAA is applicable to the appraisal provision here." Id. at *5 (quoting Salt Lake Tribune, 390 F.3d at 689).

The Court here follows our sister court in applying federal law to the question of whether a means of dispute resolution used by parties constitutes arbitration under the Act. This question turns necessarily on what Congress meant by the term "arbitration" in the federal statute. In other words, "Congress intended a 'national' definition for a 'national' policy." Fit. Tech, 374 F.3d at 6. Federal appellate courts that have examined the issue more recently are consistent in emphasizing the need for a uniform definition to avoid situations where arbitration means "different things in different states." Salt Lake Tribune, 390 F.3d at 689.

In contrast, the circuit courts employing state law definitions "articulated few reasons for doing so." Liberty Mutual, 2012 WL 718857 at *4. Indeed, the Ninth Circuit has expressed doubts about its earlier ruling applying state law, noting that it "seems counter-intuitive to look to state law to define a term in a federal statute on a subject as to which Congress has declared the need for national uniformity." Portland Gen. Elec. Co. v. United States Bank Trust Nat. Ass'n as Tr. for Trust No. 1, 218 F.3d 1085, 1091 (9th Cir. 2000) (Tashima & Lay, JJ., concurring).

For these reasons, the Court looks to federal common law to characterize whether the decision by Dixon Hughes constitutes arbitration.

### B. Appraisal or Arbitration

Under federal law, the Court must determine whether the method of dispute resolution sufficiently resembles "classic arbitration" to fall within the purview of the Act. Although courts have offered differing formulations for what constitutes arbitration, the focus of the inquiry is on the resemblance between the means of dispute resolution chosen and "classic arbitration," in

4

which the parties have agreed to be bound by the decision of the third party. Fit. Tech, 374 F.3d at 7. "Central to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute." Salt Lake Tribune, 390 F.3d at 689. The "essence of arbitration is that the parties agreed to arbitrate [their] disputes through to completion, i.e. to an award made by a third party arbitrator." Id. (internal quotations omitted). The focus of the Court, therefore, is on whether the parties agreed to be bound by the decision of the third party as to the particular issue in dispute. See McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 830 (2d Cir. 1988) (A policy qualifies as arbitration where "the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution.").

Under this framework, the service performed by Dixon Hughes falls squarely within the characterization of arbitration. Section 2.2.5 of the Agreement, referencing section 2.2.4, directs the parties to attempt first to resolve any disputes involving calculations of funds on the date of closing including: cash balance, Net Working Capital and income taxes payable and receivable. If the parties are unable to resolve the amounts themselves, the Agreement directs them to submit to a binding decision by Dixon Hughes. "If such disputed items are not resolved within 60 calendar days after receipt by Seller of the Statement, Purchaser and Seller shall promptly instruct the Greenville, South Carolina office of Dixon Hughes Goodman LLP (the "Independent Accountant") to resolve such disputed items." (SPA § 2.2.5). "The decision of such firm shall be binding upon the Parties, and the fees and expenses of such firm shall be borne one-half by Seller and one-half by Purchaser." (Id.).

In addition to establishing a binding resolution, section 2.2.5 provides procedural and substantive guidelines for the parties to make their case to Dixon Hughes.

> If issues are submitted to the Independent Accountant for resolution, (a) the Parties shall furnish such work papers and other documents and information relating to the disputed issues as the Independent Accountant may request and are available to the Parties and (b) the Independent Accountant may review only those items and amounts specifically set forth and objected to by the Parties, and if such dispute relates to the calculation of Net Working Capital, shall resolve the dispute only in compliance with the methodology used in the Net Working Capital Worksheet.

(Id.).

Several other factors support the characterization of arbitration. There is no language in the Agreement suggesting additional review of Dixon Hughes determination; nor is there any provision to suggest a means of contesting the findings by Dixon Hughes. The parties address Dixon Hughes as "the Independent Accountant," submit matters for review, and agree to share the fees and expenses equally of the determination. Each of these facts resembles "classic arbitration" and evinces a clear intention to have Dixon Hughes serve as the arbiter of this particular dispute. By communicating that the decision by Dixon Hughes would bind the parties, the contract language shows that the parties intended to resolve controversies related to Net Working Capital and Income Tax outside of the court system. There is no provision in the Agreement allowing for waiver or modification of the award. As the agreement is binding on the parties, it is fair to presume that any recourse to court would be limited to seeking some form of judicial facilitation for the agreement or resulting award. Finally, the fact that Dixon Hughes was authorized to resolve only certain matters does not alter the judgment of this Court. "Yet, arbitrations sometimes do cover only a part of the overall dispute between the parties." Fit Tech, 374 F.3d at 7.

Conversely, there is no language in the Agreement to support Defendant's contention that Dixon Hughes was serving as an appraiser. It contains no appraisal clause. The terms "appraiser" or "appraisal" are not used. The function assigned to Dixon Hughes in the

6

Agreement bears no relation to common practices of appraisal where each party hires its own appraiser, who makes an appraisal without consideration of evidence submitted by the parties. The Agreement does not appoint an umpire or independent appraiser to serve as the deciding vote between the respective appraisers.

Based on these facts, the Court finds that the resolution by Dixon Hughes as outlined in the Agreement constitutes arbitration and is governed by the Act.

C. Review of Arbitration Award

The Federal Arbitration Act provides that "at any time within one year after the [arbitration] award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Where the contract does not specify a specific court to confirm the award, then "such application may be made to the United States court in and for the district within which such award was made." Id. The Supreme Court has read this venue provision to be permissive, holding that the special venue provisions were not intended by Congress to foreclose a suit where the defendant resided. Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193, 200 (2000).

Judicial review of an arbitration award in federal court is "substantially circumscribed." Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 234 (4th Cir. 2006). In reviewing such an award, a district court "is limited to determine whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." Three S Delaware, Inc. v. DataQuick Information Systems, Inc., 492 F.3d 520, 527 (4th Cir. 2007) (internal quotation marks omitted).

7

The Act provides that a court may vacate an arbitration award on one of the following grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone a hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

9 U.S.C. § 10(a).

Neither party has challenged the specific findings of Dixon Hughes, which the Court has duly reviewed. In light of this fact as well as the deferential standard accorded to arbitrators, the Court, under 9 U.S.C. § 9, finds that the arbitrator acted within the scope of his authority and that there is no reason to vacate the award. Accordingly, under 9 U.S.C. § 13, the Court **ENTERS JUDGMENT against Defendant** for the amounts specified by Dixon Hughes.

D. <u>Attorney's Fees</u>

Plaintiff petitions this Court to award attorney's fees under N.C. Gen. Stat. § 1-569.25 which provides that a court "may allow reasonable costs of the motion and subsequent judicial proceedings." Plaintiff has provided no facts, case law, or arguments to support the position that the Court should exercise its discretion to award attorney's fees in the matter and the Court finds no reason to do so.

**III. CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Confirm Arbitration Award and Judgment (Doc. No. 13) is **GRANTED**. The Court: (1) **CONFIRMS the arbitration awards** of Dixon Hughes Goodman LLP in this matter and (2) **ENTERS JUDGMENT** on Plaintiff's

First Claim for Relief in the amount of $578,723.06 plus interest at the legal rate.  Finally, the Court (3) **DENIES** Plaintiff's motion for attorney's fees.

Signed: December 3, 2013

Robert J. Conrad, Jr.
United States District Judge